**TENNECO GAS, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

Amoco Production Company, ANR Pipeline Company, Arco Oil and Gas Company, a Division of Atlantic Richfield Company, Arkla, Inc., Associated Natural Gas Company, a Division of Arkansas Western Gas Company, Association

of Texas Intrastate Natural Gas Pipelines, Colorado Gas Transmission Corporation and Columbia Gulf Transmission Company, Conoco, Inc., El Paso Natural Gas Company, Hadson Gas Systems, Inc., Enron Interstate Pipelines, State of Louisiana, Midcon Marketing Corporation, Natural Gas Clearinghouse, Natural Gas Pipeline Company of America, Pennzoil Company, Public Service Electric & Gas Co., Transco Energy Company, Phillips Petroleum Co., et al., Meridian Oil, Inc., Southern Natural Gas Company, Kerr–McGee Corporation, Northwest Pipeline Corporation, Minnesota Department of Public Service, United Gas Pipe Line Company, Interstate Natural Gas Association of America, Piedmont Natural Gas Company, Inc., Exxon Corporation, Panhandle Eastern Pipe Line Co. and Trunkline Gas Company, Mobil Natural Gas Inc., Entrade Corporation, TXG Gas Marketing Company, Enron Gas Marketing, Inc., Houston Pipe Line Company, OXY USA Inc., Northern Border Pipeline Company, Union Pacific Resources Company, Mississippi River Transmission Corp., Tenneco Gas, Texas Eastern Transmission Corp., et al., Texaco, Inc., Vesta Energy Company, Process Gas Consumers Group, Colorado Interstate Gas Company, National Fuel Gas Supply Corp., ANR Pipeline Company, Chevron U.S.A., Inc. and Anadarko Petroleum Corporation, Intervenors.

Nos. 89–1768, 89–1772, 89–1778, 90–1005, 90–1010, 90–1016, 90–1017, 90–1021, 90–1025, 90–1026, 90–1055, 90–1056 and 90–1060.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 15, 1992.

Decided July 21, 1992.

As Amended July 21, 1992.

Scott M. Wilensky and Philip M. Marston were on the joint brief for petitioners Dept. of Public Service of the State of Minnesota and Hadson Gas Systems, Inc., in 90–1005 and 90–1055 and intervenors in 89–1768, 89–1772, 89–1778, 90–1010, 90–1016, 90–1017, 90–1021 and 90–1026. Jocelyn F. Olson and Robert Y. Hirasuna also entered appearances for petitioners.

Frederic G. Berner, Jr., with whom Ronald S. Flagg and Ernest B. Abbott for Tenneco Gas; John H. Cheatham, III, and Jean E. Sonneman for Interstate Natural Gas Ass'n of America; William G. Schaefer for ANR Pipeline Co. and Colorado Interstate Gas Co.; Richard T. Saas for Consolidated Natural Gas Co.; Leslie J. Lawner for Enron Gas Marketing, Inc.; Karyl L. Lawson for MidCon Marketing Corp.; George L. Weber for National Fuel Gas Supply Corp.; Sherrie N. Rutherford and David B. Ward for Northern Natural Gas Co., Transwestern Pipeline Co. and Florida Gas Transmission Co.; Raymond N. Shibley, Brian D. O'Neill, Bruce W. Neely, and Judy M. Johnson for Panhandle Eastern Pipeline Co., Texas Eastern Transmission Corp., and Trunkline Gas Co.; Thomas M. Patrick, Mark J. McGuire and Mary Klyasheff for Peoples Gas Light & Coke Co. and North Shore Gas Co.; Patrick R. Pope and Deborah L. Dille for Southern Natural Gas Co.; Stephen K. Schroeder, Steven W. Snarr, James T. McManus, and Joseph S. Koury for Northwest Pipeline Corp.; Gary G. Sackett and Terrie T. McIntosh for Questar Pipeline Co. and Universal Resources Corp., were on the joint brief, for petitioners in 89–1768, 90–1010, 90–1017, 90–1021, 90–1026, 90–1056, and 90–1060 and intervenors in 89–1772, 89–1778, 90–1005, 90–1016, and 90–1055. Philip R. Telleen, Paul E. Goldstein, Daniel F. Collins, J. Gordon Pennington, Deborah A. MacDonald, Jane E. Wilson, Carol A. Smoots, Allan W. Anderson, Jr., Karen Lee, James Hinchliff, Andrea Studzinski, John S. Grube, Linda S. Portasik, Kenneth L. Glick, Kevin J. Lipson, John E. Holtzinger, Jr., and Charles C. Thebaud, Jr. also entered appearances for petitioners.

Jeffrey G. DiSciullo and Jonathan L. Socolow were on the brief for petitioner Northern Border Pipeline Co. in 89–1772 and intervenor in 89–1768, 89–1778, 90–1005, 90–1010, 90–1016, 90–1017, 90–1021, 90–1026, 90–1055, and 90–1056.

Steven J. Ross, with whom Karol Lyn Newman and Stephen O. Scandurro were on the brief, for petitioner Ozark Gas Transmission Systems in 90–1025.

Timm L. Abendroth, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, Jerome M. Feit, Sol., and Joseph S. Davies, Deputy Sol., were on the brief, for respondent in 89–1768, 89–1772, 89–1778, 90–1005, 90–1010, 90–1016, 90–1017, 90–1021, 90–1025, 90–1026, 90–1055, 90–1056, and 90–1060. Joel M. Cockrell also entered an appearance for respondent.

Peter G. Esposito, Kevin M. Sweeney, and Gordon J. Smith were on the brief for intervenor Natural Gas Clearing House in 89–1768 and 89–1772.

Mario M. Garza and J. Stephen Martin for Anadarko Petroleum Corp.; Norma J. Rosner and Charles F. Hosmer for ARCO Oil and Gas Co.; Gerald P. Thurmond for Chevron, U.S.A., Inc.; Richard Harris for Kerr–McGee Corp.; John B. Chapman and Sylvia McCormack for Pennzoil Co.; Luke A. Mickum and Larry Pain for Phillips Petroleum Co. and Phillips 66 Natural Gas Co.; Ralph J. Pearson for Texaco, Inc.; and Kerry R. Brittain, Alan W. Tomme, and David B. Robinson for Union Pacific Re-

sources Co., were on the joint brief for producer-intervenors in 89–1768, 89–1772, 89–1778, 90–1005, 90–1010, 90–1016, 90–1017, and 90–1021. Richard E. Powers, Jr., Kathleen E. Magruder, Harris S. Wood, Kevin M. Sweeney, John L. Williford, Johnny J. Akins, and Jon L. Brunenkant also entered appearances for intervenors.

Joseph C. Bell entered an appearance for petitioners Citizens Gas Supply Corp. and Citizens Energy Corp. in 89–1778.

James J. Hoecker and Don S. Smith entered appearances for intervenor Arkla, Inc., in 89–1768, 89–1772, 89–1778, 90–1005, and 90–1026.

Kim M. Clark and Donald J. MacIver, Jr., entered appearances for intervenor El Paso Natural Gas Co. in 89–1768.

Stephen J. Small entered an appearance for intervenor Columbia Gas Transmission, et al., in 89–1768, 89–1772, 89–1778, 90–1005, 90–1010, 90–1016, 90–1017, 90–1021, 90–1026, 90–1055, 90–1056, and 90–1060.

David B. Robinson and Buddy Roemer entered appearances for intervenor State of Louisiana in 89–1768, 89–1772, 89–1778, 90–1005, and 90–1010.

Robert G. Hardy, Anthony J. Ivancovich, David E. Varner, and David A. Glenn entered appearances for intervenor Transco Energy Company in 89–1768, 89–1772, 89–1778, 90–1005, 90–1010, 90–1016, and 90–1017.

Carol A. Smoots, Paul E. Goldstein, Philip R. Telleen, Priscilla A. Mims, and Andrea Studzinski entered appearances for intervenor Natural Gas Pipeline Co. of America in 89–1768, 89–1772, 89–1778, 90–1005, 90–1010, 90–1017, 90–1026, 90–1055, 90–1056, and 90–1060.

James R. Lacey entered an appearance for intervenor Public Service Electric & Gas Co. in 89–1768, 89–1772, 89–1778, 90–1005, 90–1010, 90–1016, 90–1017, and 90–1021.

Don S. Smith and Steven A. Weiler entered appearances for intervenors Associated Natural Gas Co., et al., in 89–1768, 89–1772, 89–1778, 90–1005, 90–1010, 90–1016, and 90–1017.

Kevin M. Sweeney and Jack M. Wilhelm entered appearances for intervenor Amoco Production Co. in 89–1768, 89–1772, 89–1778, 90–1005, 90–1016, and 90–1021.

Michael R. Waller entered an appearance for intervenor United Gas Pipe Line Co. in 89–1768 and 90–1021.

James G. Beste and Larry J. Gunn entered appearances for intervenor Ass'n of Texas Intrastate Natural Gas Pipelines in 89–1768, 89–1772, 89–1778, 90–1005, 90–1010, 90–1016, 90–1017, and 90–1026.

Jerry W. Amos entered an appearance for intervenor Piedmont Natural Gas Co., Inc., in 89–1768 and 89–1772.

Douglas W. Rasch and C. Roger Hoffman entered appearances for intervenor Exxon Corp. in 89–1768, 89–1772, 89–1778, and 90–1016.

Bruce A. McConnell entered an appearance for intervenor Conoco, Inc., in 89–1768, 89–1772, and 89–1778.

Marge O'Connor and Jay G. Martin entered appearances for intervenor Mobil Natural Gas, Inc., in 89–1768, 89–1772, 89–1778, 90–1005, and 90–1010.

Randall S. Rich and Laura L. Murrell entered appearances for intervenor Entrade Corp. in 89–1768, 89–1772, 89–1778, and 90–1005.

Jeffrey L. Kirk and Robert W. Perdue entered appearances for intervenor TXG Gas Marketing Co. in 89–1768, 89–1772, and 89–1778.

Leslie J. Lawner entered an appearance for intervenor Houston Pipe Line Co. in 89–1768, 89–1772, 89–1778, 90–1005, 90–1010, 90–1016, and 90–1017.

Michael L. Pate entered an appearance for intervenor OXY USA, Inc., in 89–1768, 89–1772, and 89–1778.

Alan W. Tomme and Kerry Brittain entered appearances for intervenor Union Pacific Resources Co. in 89–1768, 89–1772, and 89–1778.

John B. Randolph and Juanita Feigenbaum entered appearances for intervenor Mississippi River Transmission Corp. in 89–1768, 89–1772, 89–1778, 90–1005, and 90–1055.

Ralph J. Pearson, Jr., entered an appearance for intervenor Texaco, Inc., in 89–1768 and 89–1772.

Maria M. Jackson entered an appearance for intervenor Vesta Energy Co. in 89–1768 and 89–1772.

Gail S. Gilman and Edward J. Grenier, Jr., entered appearances for intervenor Process Gas Consumers Group in 89–1768, 89–1778, 90–1005, 90–1010, 90–1016, 90–1017, and 90–1021.

Gerald P. Thurmond entered an appearance for intervenor Chevron U.S.A., Inc., in 89–1768.

Mario M. Garza and J. Stephen Martin entered appearances for intervenor Anadarko Petroleum Corp. in 89–1768.

Douglas Kent Porter and E.R. Island entered appearances for intervenor Southern California Gas Co. in 89–1772, 89–1778, 90–1005, 90–1016, 90–1017, 90–1021, 90–1026, and 90–1055.

Robert H. Benna entered an appearance for intervenor Williams Gas Marketing Co. in 89–1772, 89–1778, 90–1005, 90–1010, 90–1016, 90–1017, 90–1021, and 90–1026.

Georgetta J. Baker, Paul E. Goldstein, and Emmitt C. House entered appearances for intervenor Stingray Pipeline Co. in 89–1772, 89–1778, 90–1005, 90–1010, 90–1016, 90–1017, 90–1021, and 90–1026.

Lisa D. Harville entered an appearance for intervenor Seagull Energy Corp. in 90–1005, 90–1010, 90–1016, 90–1017, and 90–1021.

David L. Huard entered an appearance for intervenor Pacific Interstate Transmission Co. in 90–1005, 90–1010, 90–1016, 90–1017, 90–1021, and 90–1026.

Marge O'Connor entered an appearance for intervenor Superior Offshore Pipeline Co. and Texas Sea Rim Pipeline, Inc., in 90–1010.

Raymond N. Shibley, Brian D. O'Neill, Bruce W. Neely and Judy M. Johnson entered appearances for intervenors Panhandle Trading Co. and Algonquin Gas Co. in 90–1010, 90–1016, 90–1017, 90–1021, 90–1026, 90–1055, and 90–1056.

Linda K. Browning entered an appearance for intervenor Sonat Marketing Co. in 90–1016, 90–1017, 90–1021, and 90–1026.

C. William Cooper entered an appearance for intervenor United Distribution Companies in 90–1055.

Before MIKVA, Chief Judge, and WALD and SENTELLE, Circuit Judges.[1]

PER CURIAM:

## TABLE OF CONTENTS

I. Background ........................................................ 1193
 A. *Historical and Regulatory Setting* .................................. 1193
 B. *Orders 497 and 497–A* ........................................... 1194
 1. *Standards of Conduct* ........................................ 1194
 2. *Record Keeping and Reporting Requirements* ..................... 1195
 3. *Remedies* .................................................. 1195
II. Standard of Review ................................................ 1196
III. Standard (f): The Contemporaneous Disclosure Requirement ............. 1196
 A. *Transportation Information* ........................................ 1197
 B. *Sales and Marketing Information* ................................... 1199
 C. *Gas Supply Information* .......................................... 1201
IV. Standard (g): Independent Functioning to the Maximum Extent Practicable .................................................... 1202
 A. *The Pipeline Petitioners' Challenges* ............................... 1205
 1. *Separation Undermines the Principal Benefits of Vertical Integration* ............................................... 1205
 2. *The "Maximum Extent Practicable" Standard is Impermissibly Vague* ................................................. 1206
 3. *The "Independent Functioning" Requirement Should Not Apply to Employees Not Engaged in Gas Transportation Functions* ... 1206

---

[1] Parts III and V were authored by Chief Judge Mikva. Parts II and IV were authored by Judge Wald. Parts I, VI & VII were authored by Judge Sentelle.

B. ........................ *Minnesota and Hadson Gas's Challenges*1207
 1.*The "Independent Functioning" Standard is Inconsistent with the Other Standards of Conduct*1207
 2.*The "Practicability" Standard is an Irrational Response to Anticompetitive Behavior by Pipelines and Their Marketing Affiliates*1208
V. ..................... The "Sunsetting" of the Reporting Requirements1209
VI. ............................. Civil Penalties Under the NGPA1210
VII. ...................... Application of Order 497 to Joint Ventures1211
 A. ............................................ *Northern Border*1212
 B. ................................................... *Ozark*1213
VIII. ........................................... Conclusion1214

Continuing its effort to establish a new role for pipelines within the natural gas industry, the Federal Energy Regulatory Commission ("FERC" or "the Commission") promulgated Orders 497 and 497–A ("the Orders") to govern the relationship between pipelines and their marketing affiliates. Various aspects of the Orders have been challenged by members of the pipeline industry, the Minnesota Department of Public Service, and an unaffiliated gas marketer. A multitude of intervenors have also joined the fray in support of or in opposition to this rulemaking. Additionally, two joint venture pipelines challenge separate FERC orders finding their operations subject to the Order 497 requirements. We consider these petitions below.

## I. Background

### A. *Historical and Regulatory Setting*

With the promulgation of Order 436, 50 Fed.Reg. 42,408 (1985) (codified at scattered sections of 18 C.F.R.), FERC initiated a fundamental restructuring of the natural gas industry. *Associated Gas Distributors v. FERC*, 824 F.2d 981, 993 (D.C.Cir. 1987) ("*AGD*"). Prior to Order 436, pipelines served as both gas transporters and merchants, purchasing gas in long-term contracts from wellhead producers, transporting the gas through their pipeline networks, and then selling the gas to Local Distribution Companies ("LDCs") and large end-users such as utilities. *Id.* Under authority conferred by the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717–717w, FERC regulated the prices pipelines paid at the wellhead and the prices which pipelines

could charge at the end-point. *AGD*, 824 F.2d at 994–95.

In the Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. §§ 3301–3432, Congress deregulated wellhead sales, resulting in spot market prices that were usually much lower than the long-term contract prices paid by the pipelines. Nevertheless, consumers did not receive the benefit of lower producer prices because the pipelines, possessed of monopolistic distribution power, "generally declined to transport gas in competition with their own sales." *AGD*, 824 F.2d at 996. Order 436 addressed this problem by encouraging pipelines to transport gas for all marketers, or shippers, through blanket open-access authorizations. *See* 18 C.F.R. Part 284 Subpart G (open-access service is sometimes referred to as Part 284 transportation). Once a pipeline received authorization to conduct open-access transportation, it was required to sell capacity on a first-come, first-served basis to any shipper requesting the same service. Pipelines thereupon began to shed their merchant role and concentrate on their transportation opportunities under the new regime.

The new regime included deregulation of "first sales" of gas under § 601 of the NGPA, 15 U.S.C. § 3431(b)(1)(A). As defined in § 2(21) of the NGPA, 15 U.S.C. § 3301(21), first sales encompassed most transactions in gas but excepted sales by inter- and intrastate pipelines and LDCs. At the same time, the pipeline industry faced problems arising from take-or-pay clauses in their long-term purchase con-

tracts with gas producers, *see AGD*, 824 F.2d at 1021–23. Take-or-pay clauses obligate the pipelines either to purchase and take a specified percentage of a producer's deliverable gas or to make prepayment for the percentage even if not then taken. Between 1977 and 1982, the industry generally believed gas prices would rise or at least remain stable, and therefore pipeline companies agreed to the long-term take-or-pay prices above then-current levels. With the advent of competitive markets, however, gas prices tumbled, and pipelines now must either "buy over-priced gas and sell it at a loss, or decline to buy such gas and thereby incur take-or-pay liabilities." *Id.* at 1021. *See, e.g., Associated Gas Distributors v. FERC,* 893 F.2d 349 (D.C.Cir.1989) (ruling on FERC Order 500, which concerned allocation of take-or-pay liability among "all segments" of the natural gas industry), *cert. denied sub nom. Berkshire Gas Co. v. Associated Gas Distributors,* —— U.S. ——, 111 S.Ct. 277, 112 L.Ed.2d 232 (1990). Seeking to compete in the newly deregulated market environment, and perhaps ameliorate their take-or-pay liability, pipelines established marketing affiliates to sell gas on a first sales basis, free of FERC regulation.

Soon after the appearance of marketing affiliates, unaffiliated marketers complained to FERC that pipelines were granting unfair preferences to their affiliates by, among other things, providing inside information on pipeline capacity. FERC invited comments on the problem through a Notice of Inquiry into Alleged Anticompetitive Practices Related to Marketing Affiliates of Interstate Pipelines, F.E.R.C. Stats. & Regs., Regulations Preambles 1986–1990 ¶ 35,520, at 35,661 (1986). Over 100 comments later, FERC issued a Notice of Proposed Rulemaking Related to Marketing Affiliates of Interstate Pipelines, F.E.R.C. Stats. & Regs., Regulations Preambles 1986–1990 ¶ 32,445 (1987) ("NOPR"), which requested comments on proposed marketing affiliate reporting requirements, standards of conduct, and penalties for violating these provisions. FERC also announced in the NOPR the immediate creation of an enforcement task force to hear complaints of anti-competitive marketing affiliate behavior and to resolve or forward the complaints to the Justice Department or FERC for formal action.

**B. *Orders 497 and 497–A***

The rulemaking culminated with the promulgation of Order 497, F.E.R.C. Stats. & Regs., Regulations Preambles 1986–1990 ¶ 30,820, at 31,127 (1988), which was modified in some respects in Order 497–A, F.E.R.C. Stats. & Regs., Regulations and Preambles 1986–1990 ¶ 30,868, at 31,587 (1989) (codified as amended at 18 C.F.R. Parts 161 and 250.16). Order 497 applies to all pipelines with marketing affiliates, 18 C.F.R. § 161.1, and, as detailed below, answers the complaints of unaffiliated marketers by establishing standards of conduct, instituting record keeping and reporting requirements, and providing for enforcement through civil penalties.

1. Standards of Conduct

The standards of conduct comprise the heart of the Orders and attempt to eliminate any special preferences pipelines might offer their marketing affiliates. Order 497 at 31,127, 31,133. Specifically, the standards of conduct require:

a) *Equal Treatment.* Under the first four standards, 18 C.F.R. § 161.3(a)–(d), FERC directed pipelines to apply and strictly enforce applicable tariff provisions without regard to whether the shipper is an affiliate. Thus, marketing affiliates may not receive preferences on such matters as scheduling, balancing (correcting for deviations in planned capacity), transportation, storage, and speed of service. Order 497 at 31,133–36; Order 497–A at 31,594–95.

b) *Confidentiality.* Pipelines may not disclose to their affiliates any information received from non-affiliated shippers. 18 C.F.R. § 161.3(e); Order 497 at 31,138–39; Order 497–A at 31,595.[2]

c) *Contemporaneous Disclosure.* If a pipeline provides an affiliate with gas

---

**2.** The equal treatment and confidentiality standards are not challenged in this action.

transportation, sales, or marketing information, then it must contemporaneously provide that same information to "all potential shippers, affiliated and nonaffiliated, on its system." 18 C.F.R. § 161.3(f). FERC believed that standard (f) would "counteract the past and present effects of pipeline market power over transportation" that provided pipelines with unique sales and marketing information. Order 497 at 31,140; Order 497–A at 31,596–98.

d) *Independent Functioning.* FERC mandated that, "[t]o the maximum extent practicable," pipeline and affiliate "operating employees" must "function independently of each other." 18 C.F.R. § 161.-3(g). Viewing this as less "drastic" than complete organizational separation, FERC hoped standard (g), coupled with the contemporaneous disclosure and reporting requirements, would adequately deter preferential treatment. Order 497 at 31,142. FERC made clear, however, that this "case-by-case" approach left it with sufficient flexibility to "make organizational changes to separate shared employees" if necessary to eliminate preferences. Order 497–A at 31,598.

### 2. Record Keeping and Reporting Requirements

To assist in policing compliance with the standards of conduct, FERC required pipelines with marketing affiliates to file as part of their tariffs a variety of information with the Commission, such as a list of shared operating employees and facilities, the steps shippers must follow to obtain transportation service, and procedures the pipelines will use to resolve complaints. 18 C.F.R. § 250.16(b)(1); Order 497–A at 31,-599–602. FERC also required pipelines to maintain a log of "all requests for transportation service made by affiliated marketers or in which an affiliated marketer is involved." 18 C.F.R. § 250.16(b)(2).

Because of the possibility "that market affiliate abuses may not be a serious long-term problem as transportation service becomes more competitive," FERC placed a one-year sunset date of December 31, 1989, on the reporting requirements. Order 497

at 31,145. This sunset may be extended annually by the Commission upon petition, and FERC has thrice approved such requests. Order 497–A at 31,604 (extending the sunset to December 31, 1990); Order 497–B, F.E.R.C. Stats. & Regs., Regulations Preambles 1986–1990 ¶ 30,908, at 31,-880–81 (1990) (extending the sunset to December 31, 1991); Order 497–C, F.E.R.C. Stats. & Regs., Regulations Preambles ¶ 30,934 (1991), *reh'g denied,* 58 F.E.R.C. ¶ 61,139 (1992) (extending the sunset to December 31, 1992).

### 3. Remedies

If a pipeline knowingly fails to follow the § 161.3 standards of conduct or the § 250.16 record keeping and reporting requirements, FERC may assess a civil penalty of $5,000 per day until the violation ceases. 18 C.F.R. § 250.16(h). Though the NGA does not authorize FERC to collect civil penalties, § 504 of the NGPA, 15 U.S.C. § 3414(b)(6), does, and FERC asserts that the penalties would be applied to "all transportation transactions whether authorized" under the NGA or the NGPA. Order 497 at 31,153. FERC contends that unless it had information regarding both NGA and NGPA transactions, it could not discharge its NGPA responsibilities. *Id.* at 31,153–54. Accordingly, to ensure compliance with the reporting requirements, FERC claims the power to apply its NGPA civil penalty authority to NGA transactions. *See* Order 497–A at 31,602.

> In sum, Orders 497 and 497–A have two basic elements: (1) the establishment of Standards of Conduct intended to assure that pipelines do not use the essential facility in a discriminatory manner to the competitive advantage of their affiliates, and (2) the requirement that pipelines record and report the essential terms of transactions with or to the benefit of affiliates in order to allow verification of compliance with the Standards of Conduct.

Order 497–B at 31,880.

In this consolidated action, a number of pipelines challenge the contemporaneous disclosure standard (standard (f)), the inde-

pendent functioning standard (standard (g)), and FERC's assertion of civil penalty authority over NGA transactions. The Minnesota Department of Public Service and Hadson Gas Systems, Inc., contest FERC's failure to require structural separation of pipelines from their affiliates in standard (g) and the sunset provision in the record keeping and reporting requirements. Finally, Northern Border Pipeline Company and Ozark Gas Transmission System complain of separate orders in which FERC found Order 497 applicable to their operations.

For the reasons discussed below, we conclude that FERC did not adequately justify its extension of the contemporaneous disclosure requirement to gas sales and marketing information. We also hold that FERC erred in finding Order 497 applicable to Ozark's operations. The other petitions for review are without merit.

## II. Standard of Review

▆▆▆▆ We must affirm the Commission's orders unless they are arbitrary, capricious, an abuse of discretion, or not in accordance with law. 5 U.S.C. § 706(2)(A). The scope of review under this standard is narrow; as both the Supreme Court and this court have cautioned, the arbitrary and capricious standard does not sanction a reviewing court substituting its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983); *see also Computer & Communications Ind. Ass'n v. FCC*, 693 F.2d 198, 218–19 (D.C.Cir.1982) (reviewing court neither authorized nor inclined to substitute its judgment for that of agency with respect to "a choice made by the [agency] among several reasonable policy options"), *cert. denied, Louisiana Public Serv. Comm'n v. FCC*, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983). Our task is to ensure that the Commission has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2866 (internal quotation omitted).

Where an agency has considered the relevant data and articulated a satisfactory explanation for the policy choice made, its choice will be upheld.

## III. The Contemporaneous Disclosure Requirement

Pipeline petitioners challenge standard (f), which regulates the transfer of information from pipelines to their marketing affiliates. Standard (f) forbids pipelines from providing transportation, sales or marketing information to their affiliates unless the pipelines simultaneously disclose that information to all gas marketers on the pipelines' system. Standard (f), in other words, gives pipelines a choice: provide information to everyone, or no one at all. In full, standard (f) provides:

> To the extent [a natural gas pipeline] provides to a marketing affiliate information relating to transportation of natural gas, or gas sales or gas marketing it must provide that information to all potential shippers, affiliated and nonaffiliated, on its system.

18 C.F.R. § 161.3(f).

The pipelines contend that standard (f), which we will call the contemporaneous disclosure requirement, is arbitrary and capricious because it unjustifiably chills the sharing of information between pipelines and their affiliates, denying consumers the economic benefits of such information exchanges. In addition, and more narrowly, the pipelines attack standard (f)'s application of the contemporaneous disclosure requirement beyond *transportation* information, to gas *sales* and *marketing* information, on the ground that the regulation of sales and marketing information is unjustified and beyond FERC's statutory authority.

We uphold standard (f) to the extent that it regulates the exchange of transportation information. The contemporaneous disclosure requirement, we find, is a reasonable means of advancing a permissible objective, eliminating the anti-competitive consequences of pipelines' market power over transportation. But because we conclude

that FERC has failed to justify its decision to regulate the exchange of sales or marketing information, which includes information unrelated to pipelines' market power over transportation, we remand for further explanation.

## A. *Transportation Information*

■ As FERC concedes, the sharing of information between pipelines and their marketing affiliates has efficiency benefits. *See* Order 497 at 31,129. A pipeline naturally becomes aware of certain information—the sudden availability of capacity at a bottleneck, for example—that it can quickly, easily and economically pass along to its marketing affiliate, avoiding transaction costs, such as the costs of gathering and transmitting information, negotiating, and contracting. In a competitive market, the efficiencies of the pipeline-affiliate relationship should produce benefits for consumers. *See* 3 P. Areeda & D. Turner, Antitrust Law ¶ 725d, at 201 (1978) ("Whenever vertical integration produces new efficiencies, some of the cost savings ... [will] be translated into a price reduction and ... [will] save productive resources.")

On the other hand, as FERC found, transportation of gas is not competitive and marketing affiliates present a potential for anti-competitive abuse. *See* Order 497 at 31,129–30. And one way in which pipelines can improperly favor affiliates, FERC found, is by giving them information regarding transportation while withholding that information from competing shippers. *See* Order 497 at 31,140. The record supports that finding. The Justice Department's comments make clear that there is at least a theoretical danger that pipelines will favor their marketing affiliates in providing information, and that the result would be anti-competitive:

> If a pipeline did not have an affiliated marketer, it would be in its interest to disseminate widely information relevant to operating constraints, capacity, and available receipt points, limited only by the cost of doing so. The affiliate relationship, however, creates an incentive for the pipeline to withhold information

that otherwise would be made available to the affiliate's competitors. Withholding this information from non-affiliated shippers reduces their ability to arrange transactions efficiently.

Comments of the United States Department of Justice in Response to the Notice of Inquiry (Dec. 29, 1986) at 15.

The record also contains evidence that the discriminatory and anti-competitive distribution of information is not just a theoretical danger, but a real one. To pick one example, the record includes the sworn statement of Mr. Stacey T.J. Wong, the former president of an unaffiliated marketer, who recounted an incident in which one marketing affiliate tied up a pipeline interconnect crucial to Mr. Wong's independent company after the affiliate learned from its pipeline parent about the availability of capacity—and filled it—before Mr. Wong's company even knew it existed. *See* Joint Comments of Indicated Producers (Dec. 29, 1986) Appendix B at 9–10; *see also id.*, Appendix D (containing discovery responses of a pipeline company stating that it had provided transportation information to its marketing affiliate and that, as a result, the affiliate may have "displac[ed] existing sale[s]").

We disagree with the pipelines' contention that "[t]he record is devoid of any reasoned decisionmaking showing that the [disclosure] restriction would benefit gas consumers." Joint Brief for Pipeline Petitioners at 40. The record clearly contains evidence supporting FERC's conclusion that pipelines, which have market power over transportation service, give their marketing affiliates an undue competitive advantage when they give their affiliates information they do not also make available to other marketers. Quite likely, as the pipelines say, regulation of information exchanges will undermine some of the benefits of pipeline-affiliate integration (though we note that the pipelines have failed to quantify them, *cf. Illinois Bell Telephone Co. v. FCC*, 740 F.2d 465, 474 (7th Cir.1984) (noting that Bell operating companies, which were challenging an analogous FCC restriction, failed to produce studies quanti-

fying the efficiencies, "suggest[ing] to us that they doubted that such studies would come up with impressive numbers")). But even if the information regulation will exact some efficiency costs, the benefits to consumers of competition among shippers would outweigh those costs, or so FERC could reasonably find based on the record in these proceedings.

 Having concluded as a general matter that FERC was justified in deciding to regulate the exchange of transportation information, we are left with the question whether FERC's choice of regulatory alternatives is reasonable—a question, as we noted above, *see supra* p. 1196, on which FERC is entitled to substantial deference. We believe that the decision to adopt a contemporaneous disclosure requirement was well within FERC's discretion, despite the pipelines' arguments to the contrary. The costs on pipelines do not seem excessive given FERC's announcement that pipelines can meet standard (f)'s directive simply by posting the information on electronic bulletin boards. *See* Order 497–A at 31,-596. And we are not persuaded by the pipelines' charge that standard (f) will prevent them from relaying necessary business information to their marketing affiliates. FERC has exempted from the contemporaneous disclosure requirement information a pipeline must give its affiliate in order to carry out specific transactions between the two. *See* Order 497–A at 31,596; *see also Algonquin Gas Transmission Co.*, 58 F.E.R.C. ¶ 61,140, at 61,441–42 (1992) (approving as consistent with standard (f) a pipeline's proposal to "contemporaneously disclose information provided to an affiliate except where the information is limited to that required to negotiate, perform under, and administer specific contracts with the affiliate for transportation, purchase or sale of gas, where such specific information does not also communicate general information about pipeline sales, marketing or transportation").

The pipelines charge that standard (f), though cast as a moderate regulatory fix, is really a "sweeping, draconian ban" on the provision of information to affiliates.

Joint Brief for Pipeline Petitioners at 43. Faced with the choice of giving information to no one or everyone, the pipelines say, they will choose no one. And that will hurt consumers, in the pipelines' view, because they will not benefit from wider information disclosure or from the efficiencies of pipeline-affiliate integration.

We are not persuaded. As the Justice Department said in its comments, it is in a pipeline's "interest to disseminate widely information relevant to operating constraints, capacity and available receipt points, limited only by the cost of doing so." Justice Department Comments, *supra*, at 1196. Thus, FERC could reasonably conclude that the contemporaneous disclosure requirement will not harm gas consumers because pipelines will have an incentive to disseminate widely information that could help them sell their product, transportation. Standard (f) imposes few direct costs, as we noted. The requirement does impose what might be considered indirect costs in that it reduces the likelihood that a pipeline's affiliate, and not an independent marketer, will close the deal. (Standard (f), we should note, does not eliminate the possibility that a pipeline will sell to its affiliate; in fact, the smaller the market of shippers the more likely an affiliate will end up with the sale.) But it would plainly be preferable for a pipeline to do business with an independent marketer than not to do business at all, and it is therefore unlikely that standard (f) will prevent much information from reaching the market.

The pipelines, finally, argue that it is nonsensical to regulate the transfer of information from pipelines to their marketing affiliates while not regulating the transfer of information from local distribution companies ("LDCs") or gas producers to their marketing affiliates. But regulation of producers and LDCs is a state matter. *See* National Gas Act § 1(b), 15 U.S.C. § 717(b). And we know of nothing that prevents pipelines from petitioning state regulatory authorities to apply similar restrictions to the LDC-affiliate or producer-affiliate relationships. In fact, we are told that some states already have regulations similar to

standard (f), and other states go further, requiring strict organizational separation. *See* Transcript of Oral Argument (Apr. 15, 1992) at 66–67.

We conclude that the contemporaneous disclosure requirement—at least as it affects information regarding transportation, where pipelines have monopolistic market power—reflects a reasonable effort to promote a competitive market without significantly harming existing efficiencies. FERC reasonably concluded that "information concerning transportation must be available to all who use a pipeline and that to allow otherwise would be to allow a pipeline to use its market power over transportation to the advantage of itself and its corporate affiliates." Order 497 at 31,140.

## B. *Sales and Marketing Information*

■ Standard (f) requires not only the disclosure of transportation information but, as FERC stressed, "the rule requires contemporaneous disclosure of transportation, *or* gas sales, *or* marketing information." Order 497–A at 31,597 (emphasis in original). On the record before us, we are unable to conclude that standard (f)'s application to sales and marketing information is justified; nor can we be confident that FERC possessed the statutory authority to regulate the transfer of sales and marketing information from pipelines to their affiliates. Accordingly, we remand for further explanation.

Order 497 states that the Commission's purpose in regulating the pipeline-affiliate relationship is to "prevent preferential treatment of an affiliated marketer by an interstate pipeline in the provision of *transportation* services." Order 497 at 31,127 (emphasis added). That, as we have explained, is a defensible purpose because pipelines have monopolistic market power over transportation. The validity of standard (f)'s regulation of transportation information follows; pipelines, FERC reasonably concluded, should not be able to prefer their affiliates with information the pipelines obtain from their preferred market position.

That reasoning, however, does not *a fortiorari* support the extension of the contemporaneous disclosure requirement to information pipelines obtained *not* as a result of their preferred market position. FERC concedes that pipelines do not now have market power over the marketing or sale of natural gas, and that at least some marketing and sales information does not come from pipelines' current market power over transportation. *See* Order 497–A at 31,596. Accordingly, the extension of the contemporaneous disclosure requirement to marketing or sales information requires independent justification. Without an adequate justification, we would likely have to find that the regulation of sales and marketing information is arbitrary and capricious; it would undermine the efficiencies of pipeline-affiliate integration without promising any compensating benefits. And without an adequate justification, the regulation might well be beyond FERC's statutory authority. Congress has authorized FERC to regulate practices that are *"unduly* discriminatory, or preferential," National Gas Act § 5(a), 15 U.S.C. § 717d(a) (emphasis added), and FERC would appear to lack the authority to prevent pipelines from preferring their affiliates with exclusive access to sales or marketing information unless that sort of preference is undue or, at least, necessary to prevent undue preferences.

One might have expected FERC to offer a narrow, prophylactic explanation and defense for standard (f)'s application to sales and marketing information. FERC might have said that standard (f) covers sales or marketing information only to the extent that what a pipeline calls "sales" or "marketing" information is really transportation information. FERC, under that approach, placed "sales" and "marketing" information in the ambit of standard (f) merely in order to prevent pipelines from evading the contemporaneous disclosure requirement by labeling certain information "sales" or "marketing," instead of "transportation." Sales or marketing information that is truly unrelated to a pipelines' market power over transportation, under this approach, would not be subject to standard (f).

We have no occasion to consider the adequacy of that narrow interpretation and explanation of standard (f) because FERC's order leaves no doubt that the Commission sees the rule as applying broadly to *all* information, not just information that is really transportation information. The only stated exception to standard (f) is information necessary to process an affiliate's request for transportation service. *See* Order 497–A at 31,596. And "if a pipeline and its affiliate's operating personnel are functioning independently," FERC says in the second of the challenged orders, "a pipeline's communications with the affiliate should be limited to specific information regarding the affiliate's transportation request or service." *Id.* Indeed, FERC stresses, "[t]here is no need for a pipeline to share transportation, sales or marketing information with its affiliate other than information necessary to process the affiliate's request or to provide the requested transportation service." *Id.*

The Orders, then, fairly interpreted, bar the exchange of sales or marketing information that is wholly unrelated to transportation information. Standard (f), as we read it, prohibits pipelines from sharing with their marketing affiliates information concerning potential marketing opportunities, even where that information was developed from public sources or other sources entirely unrelated to a pipeline's transportation service. The pipeline petitioners offer a helpful example: By canvassing public materials, a pipeline might develop information identifying public utilities interested in using natural gas for the first time in the generation of electricity (perhaps in the wake of the Clean Air Act). Under standard (f), the pipeline could not share that marketing information exclusively with its marketing affiliate.

It may be, as intervenors suggest, that the example is atypical, that the vast bulk of the information pipelines' provide their affiliates relates to the pipelines' transportation service, that it is often difficult to distinguish gas transportation, gas sales, and gas marketing information, and that any overinclusiveness in standard (f) can be justified as outweighed by the benefits of a bright-line rule. We cannot consider that justification, however, because that is not the one FERC has offered.

Instead, FERC (which devotes little space to its decision to regulate sales and marketing information) offers the following justification: "[A] pipeline may have sales or marketing information that it obtained as a result of its past monopoly power over transportation. To make this information available to its affiliate but not to others could give the affiliate a competitive advantage." Order 497–A at 31,596; *see also* Order 497 at 31,140 (containing similar language). The explanation is unsatisfactory. For one, it is unsupported. We see no evidence in the record—and FERC points to none—for the assertion that the sales and marketing information pipelines use today is a result of their "*past* monopoly power over transportation." The assertion strikes us as counterintuitive. The sales and marketing of gas would seem to depend on *current* information—a surmise that *is* supported by evidence in the record that pipelines' sales and marketing information includes information developed through ongoing customer calls and reviews of filings with state and federal regulator agencies, trade publications, and market reports. *See, e.g.,* Request for Rehearing of Tenneco Gas Pipeline Group, Inc. (July 1, 1988) at 16.

The second problem with FERC's explanation is that it is too narrow to sustain the broad reach of the contemporaneous disclosure requirement. Even if some of a pipeline's sales and marketing information is a product of the pipeline's past market power, surely not all of it is. FERC seems to concede as much when it says that "a pipeline *may* have sales or marketing information that it obtained as a result of its past monopoly power over transportation." Order 497–A at 31,596 (emphasis added). But standard (f), as FERC has presented it, applies to sales and marketing information obtained from *any* source, including sources that could have no link to a pipeline's past or even current market power.

We suspect that the difficulties we have identified with standard (f) may have their source in a basic misconception held by FERC. The Commission appears to believe that *any* advantage a pipeline gives its marketing affiliate is improper. The Commission's brief, for example, states that FERC has the authority to adopt and apply a broad standard (f) because "sales and marketing information, like transportation information, can afford a pipeline affiliate a significant advantage." Brief for Respondent FERC at 37. But advantages a pipeline gives its affiliate are improper only to the extent that they flow from the pipeline's anti-competitive market power. Otherwise vertical integration produces permissible efficiencies that "cannot by themselves be considered uses of monopoly power." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). As it stands, therefore, because standard (f) covers sales and marketing information, it may well reflect a remedy improperly disproportionate to the identified ailment, pipeline's market power over transportation. *See Associated Gas Distributors v. FERC*, 824 F.2d 981, 1019 (D.C.Cir.1987), *cert. denied,* 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988). Again, it may be that regulation of sales and marketing information is necessary to address the anti-competitive effects of exchanging transportation information. But FERC has not offered that or articulated any other satisfactory explanation for standard (f). Accordingly, we must remand. On remand, the Commission should reconsider its justification for applying standard (f) to sales and marketing information and ensure that the final requirement is reasonably tailored to meet the Commission's goals of improving the market and benefitting consumers, as well as preventing undue discrimination.

## C. *Gas Supply Information*

█ We must consider one subsidiary issue under this heading—the pipeline petitioners' challenge to FERC's announcement that standard (f) applies to "released gas" information. Like FERC's decision to regulate sales and marketing information, this requires a remand for fuller explanation.

In Order 497, the Commission adopted standard (i), which provided:

> If asked by a potential shipper, [the pipeline] must identify any information relating to released gas that is mitigating the pipeline's take-or-pay liability if it has provided that information to its marketing affiliate.

53 Fed.Reg. 22161. In Order 497, FERC also adopted standard (f), the contemporaneous disclosure provision. In Order 497-A, FERC slightly modified standard (f), replacing "and's" with "or's," in order to make clear that the information-sharing requirement applies to transportation *or* gas sales *or* marketing information. Finally, and this is what petitioners challenge, FERC in Order 497-A eliminated standard (i), stating as follows:

> On rehearing, the Commission has decided to eliminate this standard of conduct. The Commission considers information given to an affiliate regarding gas released by the pipeline to be "gas sales or marketing" information and therefore already included in the standard of conduct requiring contemporaneous disclosure of information provided to an affiliate.

Order 497-A at 31,599.

The pipelines attack the decision reflected in the quoted sentences as lacking in any explanation or basis in the record. They also argue that it would be fundamentally unfair to apply the new approach retroactively to the date of Order 497's issuance. FERC replies that the Commission's "clarification" is merely a reasonable elimination of a duplicative rule.

We agree with FERC that it is within the Commission's discretion to treat "released gas" information as sales or marketing information. But the legitimacy of FERC's decision to subject released-gas information to standard (f)'s contemporaneous disclosure requirements stands or falls on the legitimacy of subjecting sales or marketing information to the disclosure requirements. As above, released gas information that is

really transportation information would seem to be appropriately subject to the contemporaneous disclosure requirement, while released gas information that is not transportation information—and therefore apparently irrelevant to a pipeline's market power over transportation—may not be appropriately regulated, depending on FERC's explanation on remand.

Although we remand, we note that FERC's counsel stated at oral argument that he "can't imagine" that the Commission would retroactively apply standard (f) to released-gas information—that is, that standard (f)'s application to released-gas information would begin with the issuance of Order 497–A. Transcript at 60. As we have indicated, the broad language of standard (f)—"transportation or sales or marketing information"—can fairly be read to include the information that had been in standard (i). But standard (i) required pipelines to disclose "released gas" information that it had provided to its affiliates *only* "[i]f asked by a potential shipper." Standard (f), by contrast, requires disclosure the minute the pipeline provides information to an affiliate, whether or not anyone asks for it. Applying standard (f) to released-gas information exchanged prior to the issuance of Order 497–A might well be fundamentally unfair, and we hope the Commission avoids the expense of litigation over this issue by announcing that it will not retroactively apply standard (f) to released gas information.

IV. Standard (g): Independent
Functioning to the Maximum
Extent Practicable

As discussed above, *see supra* p. 1197, a pipeline has an obvious incentive to favor its own marketing affiliate; profits to the affiliate are profits to the pipeline. That incentive raises the potential for anticompetitive behavior because a pipeline may seek to use its dominant market power over the transportation of gas to restrict competition against its marketing affiliate and thereby raise the prices that its affiliate can charge for the sale of gas. As the

Department of Justice explained in its comments to the Commission:

A regulated firm [*i.e.*, a pipeline company] can ... attempt to earn monopoly profits if the regulated facility it controls [*i.e.*, a pipeline] is essential to the production or use of the unregulated product or service [*i.e.*, the sale of natural gas].... [T]he regulated firm may provide to its competitors in the unregulated market [*i.e.*, nonaffiliated shippers] a lower quality of access to the regulated essential product or service, or impose costly conditions on access, and thereby affect adversely its competitors' ability to compete in the unregulated market. In [such] case, prices in the unregulated market will be raised, output will be inefficiently low, and social welfare will be reduced.

Comments of the United States Department of Justice in Response to the Notice of Inquiry (Dec. 29, 1986) at 6–7; *see also* Statement of the United States Federal Trade Commission Staff (Jan. 29, 1987) at 7–8.

No sooner had pipelines begun setting up marketing affiliates than the Commission began receiving complaints from nonaffiliated gas marketers that pipelines were indeed using their market power over gas transportation to provide an unfair advantage to their own marketing affiliates. Among other complaints, a number of nonaffiliated marketers alleged that pipelines were using information obtained by virtue of their market power over transportation to subtly discriminate against nonaffiliated shippers and in favor of their own affiliates. For example, in one case reported to the Commission, an independent marketer reported that a pipeline with which it was dealing delayed its transportation requests on several occasions while the pipeline's marketing affiliate, using information gleaned from the transportation request, approached the gas supplier and sought to purchase the gas for itself. Notice of Proposed Rulemaking Related to Marketing Affiliates of Interstate Pipelines, F.E.R.C. Stats. & Regs., Regulations Preambles

1986–1990 ¶ 32,445, at 33,564 (1987).[3] Similarly, comments submitted by a group of gas producers reported how a pipeline had discriminated against nonaffiliated marketers by releasing valuable capacity information only to its marketing affiliate. Joint Comments of Indicated Producers (Dec. 29, 1986) at 15. As explained by one commentator, such selective disclosure of capacity information places nonaffiliated marketers at a severe competitive disadvantage:

> [T]he location of capacity bottlenecks has a dramatic effect on transportation routes and costs, and the availability of capacity at bottleneck points can change quickly. If a bottleneck on the system opens up and makes available a cheaper route, the affiliate will learn of the change through routine information exchanges, while the independent buyer or seller may never hear of it. Or if he does hear of it, it may be too late because the affiliate has absorbed the capacity.

Joint Comments of Indicated Producers (Dec. 29, 1986) Appendix B at 8. That same commentator reported on two pipelines which had withheld public disclosure of their intention to begin "open access" transportation until their marketing affiliates had an opportunity to line up new customers. By the time competing independent marketers became aware of the new pipeline capacity, the affiliated marketers had garnered a substantial portion of the market and the available transportation capacity. *Id.* at 10–11.

The Commission recognized that "one possible means of alleviating the insider information problem ... [would be] to prohibit the sharing of employees and offices between the pipeline and its gas marketing affiliate...." *See* Notice of Inquiry into Alleged Anticompetitive Practices Related to Marketing Affiliates of Interstate Pipelines, F.E.R.C.Stats. & Regs., Regulations Preambles 1986–1990 ¶ 35,520, at 35,661 (1986). In comments submitted to the Commission, however, the Department of Justice cautioned that in seeking to address anticompetitive behavior stemming from the pipeline-affiliate relationship, the Commission "must also consider the extent to which various remedies would interfere with any efficiencies that may stem from pipeline integration into marketing." Justice Department Comments, *supra*, at 7–8. For example, several commentators urged that the integration of pipelines and marketing affiliates ultimately *benefits* consumers by eliminating the duplication of such overhead expenses as accounting, legal, data processing and clerical services,[4] reducing the transaction costs of gathering and transmitting information, negotiating and contracting,[5] and helping pipelines alleviate their take-or-pay liability.[6] Both the Department of Justice and Federal Trade Commission staff urged that in selecting a remedy the Commission carefully balance both the costs and benefits of pipelines' expansion through affiliates into gas sales and marketing. *Id.* at 8 ("The selection of a remedy ... is thus a delicate balancing process involving the degree of competitive harm, the effectiveness of the remedy, and the competitive and administrative costs of the proposed remedy."); Statement of the

---

3. Another incident was reported to the Commission in which an independent consultant putting together gas supply packages for sale on the market approached a pipeline regarding transportation of the gas. The pipeline, however, learning of the availability of the gas by virtue of the consultant's request for transportation, sent its marketing affiliate to the producer to make a counteroffer for the gas. *Id.* at 33,563.

4. *See, e.g.,* Supplemental Comments of Exxon Corp. (July 23, 1987) at 2–3; Comments of Eastern Kentucky Production Co. (July 23, 1987) at 6.

5. *See, e.g.,* Comments of Tenneco Inc. (Dec. 12, 1986) at 15–16; Comments of ANR Pipeline Co. and Colorado Interstate Gas Co. (July 24, 1987)

at 11. In particular, the staff of the Federal Trade Commission noted that pipelines may be particularly efficient gas marketers because of their knowledge of and experience in all aspects of gas production. *See* Statement of the United States Federal Trade Commission Staff, *supra*, at 20–22.

6. *See, e.g.,* Comments of SNG Trading, Inc. (Dec. 19, 1986) at 2. The pipeline petitioners argue that "only marketing affiliates have any significant incentive to help[ ] the pipeline meet its purchase commitments under its long-term producer contracts." Joint Brief for Pipeline Petitioners at 15.

United States Federal Trade Commission Staff, *supra,* at 3 ("Selection of the optimal policy ... involves balancing ... the[ ] ... efficiencies [of integration] against the potential welfare losses created by anticompetitive behavior.").

In making that balance, the Commission first rejected the extreme position that the Commission should do nothing, concluding that

> in light of evidence of no prior consensus within the industry about what pipeline marketing affiliate practices were improper, the specific instances of abuse actually adjudicated by the Commission, and the many allegations of unlawful behavior raised to the Commission in response to the [Notice of Inquiry] ... there are grounds for Commission concern and action.

Order 497 at 31,128. But the Commission also found that the record did not support imposition of such "radical" structural remedies as complete physical separation, divorcement (prohibiting pipelines from doing business with their affiliates), or divestiture. "Structural remedies that could impede the ability of affiliated marketers to compete," the Commission reasoned, "may reduce the choices available to buyers and sellers of gas for moving gas in the marketplace." Order 497 at 31,129. Instead, the Commission settled on an intermediate, flexible remedy that allows the Commission to consider the particular circumstances of individual pipelines and their marketing affiliates and to order that level of separation that best accommodates the twin goals of deterring and preventing affiliate favoritism and preserving for consumers, to the extent possible, the benefits of vertical integration. In its own words:

> The Commission does not agree with the commentators who state that a complete separation of pipeline and marketing affiliate is necessary to prevent unduly discriminatory conduct. The Commission believes less drastic requirements will achieve the same result with-

out imposing one form of organization on all pipelines no matter what their circumstances. The Commission believes the standards of conduct and the reporting requirements ... will be a sufficient deterrent to preferential treatment of a marketing affiliate by its affiliated pipeline because its transactions with its marketing affiliate will be open to public scrutiny and because it will be subject to enforcement actions in the event it violates a standard of conduct. The Commission therefore is not mandating organizational separation, but only requiring it to the maximum extent practicable. Different pipelines are faced with different practical circumstances and may not be able to accomplish organizational separation to the same degree.

Order 497 at 31,142. The Commission thus ordered in standard (g) that a pipeline's operating employees must, to the maximum extent practicable, function independently of the operating employees of that pipeline's marketing affiliate.[7]

Standard (g), predictably, draws fire from both sides: the regulated pipelines ("pipeline petitioners") as well as the Minnesota Department of Public Service, representing the interests of its consumer residents and businesses, and its co-petitioner Hadson Gas Systems, Inc., an independent gas marketing firm in competition with pipeline marketing affiliates ("Minnesota and Hadson Gas"). The pipeline petitioners challenge the standard as too strict, arguing that *requiring pipeline and affiliate operating personnel to function independently of each other abrogates the benefits to the public derived from the integration of pipelines into gas sales and marketing.* They further argue that standard (g) is impermissibly vague and should not be extended beyond transportation employees to pipeline employees engaged in gas sales, purchasing and marketing. Petitioners Minnesota and Hadson Gas, in contrast, argue that the independent functioning re-

---

**7.** Specifically, the independent functioning standard provides that:

> To the maximum extent practicable [a pipeline's] operating employees and the operating employees of its marketing affiliate must function independently of each other.

18 C.F.R. § 161.3(g).

quirement does not go far enough to isolate pipelines from their marketing affiliates. They assert that once the Commission found that regulated pipelines have an incentive to favor their affiliates, and that such preferences are contrary to the public interest, the Commission was compelled to mandate complete physical and organizational separation of pipelines and their affiliates. The Commission's softer response of requiring independent functioning to the maximum extent practicable is irrational, they argue, because the sharing of personnel and facilities is fundamentally inconsistent with the other standards of confidentiality, fair dealing and full disclosure encompassed in the pipeline-affiliate rulemaking. Ultimately, we find the challenges of both parties without merit.

## A. *The Pipeline Petitioners' Challenges*

### 1. *Separation Undermines the Principal Benefits of Vertical Integration*

Citing the Commission's finding that "radical" structural remedies are not necessary to prevent preferential treatment for marketing affiliates, the pipeline petitioners argue that in fact the independent functioning requirement is, in effect, just as stringent, just as unwarranted, and just as harmful to consumers. That is, like the severe remedies rejected by the Commission, the independent function standard denies to consumers the principal benefits of integration of pipelines and marketing entities.

We find the pipelines' argument overstated in two respects. The first is its attempt to blur the distinction between the "radical" remedies rejected by the Commission and the practicability standard adopted by the Commission. While standard (g) will no doubt require the separation of now-shared *operating* employees in many cases, the standard does permit the sharing of *non-operating* personnel, as well as the use of common facilities. Order 497 at 31,142. This level of integration preserves

at least some of the efficiencies that would be lost by the "radical" remedy of complete separation of personnel and facilities. Moreover, the practicability rule allows for a level of flexibility that would not be possible under the more radical remedies. That is, in those situations where the efficiencies of integration greatly outweigh the potential for anticompetitive abuse, standard (g) permits the Commission to take that into consideration in determining whether and to what extent the sharing of pipeline and affiliate personnel will be allowed. For example, in *Ringwood Gathering Co.*, 55 F.E.R.C. ¶ 61,300 (1991), the Commission concluded that although the pipeline and the affiliate shared all three of the pipeline's operating employees, it had complied with the independent functioning standard and was entitled to a partial waiver of the simultaneous disclosure standard due to its small size and the lack of interest by nonaffiliates in transportation on its pipeline.

The second flaw lies in the pipeline petitioners' argument that the independent functioning requirement so undermines the benefits derived from integration of pipelines and marketing entities as to make such arrangements not worth the candle. As the Commission readily concedes, there are efficiencies to be derived from such integration and any separation reduces those benefits to some extent. The pipeline petitioners' argument, however, conveniently ignores the concomitant *costs* of such integration, *i.e.*, the potential for anticompetitive abuse. That there are some benefits foregone as a result of the Commission's regulations is certainly not a sufficient reason to strike down the regulations. The real question is whether those foregone benefits *exceed* the benefits gained as a result of the independent functioning standard of conduct. On that more refined question, however, the pipeline petitioners do not offer a reasoned basis for overturning the Commission's expert judgment.[8] They have made no attempt to

**8.** Nor are we persuaded that the Commission has impermissibly overlooked the benefits marketing affiliates provide in relieving pipelines' take-or-pay liability. Based on its review of

specific submissions on this issue, the Commission concluded that "a pipeline can undertake take-or-pay negotiations even if the pipeline and its marketing affiliate do not share any person-

quantify the efficiencies lost on account of the independent functioning requirement. *See, e.g., Illinois Bell Telephone v. FCC,* 740 F.2d 465, 474 (7th Cir.1984) (incumbent on party arguing that FCC had failed to consider costs of separating service and equipment in telecommunications industry to come forward with quantifiable data to support claim). In asking this court to overturn the Commission's conclusion that the independent functioning requirement strikes a reasonable balance between preserving some of the benefits of integration and deterring and preventing anticompetitive abuse, the pipeline petitioners seek to have this court substitute its policy judgment for that of the Commission. But like the court in *Computer & Communications, supra,* we are neither inclined nor authorized to do anything of the kind.[9]

2. The "Maximum Extent Practicable" Standard is Impermissibly Vague

██ The pipeline petitioners also argue that the requirement that pipelines and their affiliates operate independently "to the maximum extent practicable" is impermissibly vague, particularly since violation of the standard exposes a pipeline to civil penalties. We agree with the Commission, however, that the regulatory scheme for monitoring pipelines' compliance with standard (g) adequately addresses this concern. In Order 497, the Commission ordered each pipeline with a marketing affiliate to file tariff sheets listing its shared operating

personnel and facilities and its procedures for complying with the various standards of conduct, including standard (g). Following such submissions, the Commission staff evaluates each company's organization and procedures for compliance with the standards of conduct and either approves them or requires additional filings until the Commission deems the pipeline to be in compliance. As a result of this evolving process, each pipeline will end up operating under specific guidelines geared to its own situation and will not be required to depend solely on the general "maximum extent practicable" standard. Under these circumstances, we reject the pipeline petitioners' claim that the independent functioning standard is impermissibly vague.

3. The "Independent Functioning" Requirement Should Not Apply to Employees Not Engaged in Gas Transportation Functions

██ Orders 497 and 497–A are "intended to prevent preferential treatment of an affiliated marketer by an interstate pipeline in the provision of transportation services." Order 497 at 31,127. In their final challenge to standard (g), the pipeline petitioners argue that the Commission's orders exceed this stated intent because they require *all* pipeline operating personnel (*i.e.*, sales, purchasing and marketing employees), not just pipeline transportation personnel, to function independently of affiliate personnel. The pipeline petitioners ar-

---

nel." Order 497 at 31,143. Petitioners do not challenge that statement. Their sole contention is that take-or-pay relief efforts can be "enhanced" by the participation of a marketing affiliate who has knowledge of the pipeline's supply contracts and of the amount of take-or-pay relief obtained from the sale of gas under different contracts. Joint Brief for Pipeline Petitioners at 32. That argument, however, is simply a particularized version of the pipeline petitioners' basic claim that there are costs to the Commission's regulation. That take-or-pay negotiations will not be "enhanced" is one cost that the Commission could reasonably balance against the benefits to be derived from some level of separation between pipelines and their marketing affiliates.

**9.** In attempting to rebut this argument, the pipeline petitioners do not argue that the line draw-

ing involved in the independent functioning standard is a flawed response to the problem of anticompetitive abuse stemming from the pipeline-affiliate relationship. Rather, the pipeline petitioners broadly challenge the basis for ordering *any* separation of pipelines and marketing affiliates. The pipeline petitioners assert that having regulated in favor of open access in Order 436 and imposed strict standards of conduct proscribing preferences in Orders 497 and 497–A, the Commission had no rational basis for imposing *any* structural remedy *at all.* Joint Reply Brief for Pipeline Petitioners at 8–9.

We need not dwell long on this argument; it seems eminently reasonable for the Commission to conclude that the likelihood of affiliate favoritism and illicit passing of information between pipeline and affiliate would be reduced if their operating personnel functioned independently of each other.

gue that this requirement is arbitrary in that it does not promote the Commission's goal of nondiscriminatory transportation.

While the Commission did not delineate in any detail its rationale for declining to limit the independent functioning standard to pipeline transportation personnel, we think its rationale is clearly discernible in light of the regulatory goals underlying the independent functioning standard. *See Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (court can uphold agency decision "of less than ideal clarity if the agency's path may reasonably be discerned"). That is, while the Commission has ordered that pipeline and affiliate personnel operate independently of each other, there is no requirement that pipeline personnel engaged in transportation services must function independently of pipeline personnel engaged in gas sales and marketing. Indeed, as the producer intervenors point out, pipeline transportation personnel routinely coordinate activities with pipeline marketing personnel. Joint Brief for Producer–Intervenors in Support of Respondent at 24. Thus, excepting pipeline marketing and sales personnel from the requirements of the independent functioning standard could easily open a "back door" communication channel that would undermine the prophylactic design of the independent functioning standard. Information that could not be easily communicated *directly* from a pipeline transportation employee to a marketing affiliate employee could, under the pipeline petitioners' proposed limitation on the independent functioning standard, nonetheless reach the same destination via pipeline sale and marketing personnel. We think the Commission acted within its discretion in crafting a rule that keeps such a door firmly closed.

### B. *Minnesota and Hadson Gas's Challenges*

The State of Minnesota and Hadson Gas levy two broad attacks on the independent functioning standard. They argue first that standard (g) is fundamentally inconsistent with the other standards of conduct

in the pipeline-affiliate rule and second that mandating independent functioning only "to the maximum extent practicable" is an irrational response to a problem "inherent" in the pipeline-affiliate relationship. We do not find either argument compelling.

### 1. The "Independent Functioning" Standard is Inconsistent with the Other Standards of Conduct

Minnesota and Hadson Gas assert that the independent functioning standard is in conflict with the other standards of conduct, particularly standard (e), which bars a pipeline from disclosing to its affiliate information supplied by a nonaffiliated shipper, and standard (f), which requires a pipeline to simultaneously disclose to nonaffiliated shippers any information that it provides to its affiliate. 18 C.F.R. §§ 161.-3(e), (f). They argue that once the Commission found that information in the hands of the pipeline—such as gas supply data gleaned from nonaffiliated shippers' requests for transportation or information pertaining to pipeline capacity—was competitively significant, and that pipelines have an incentive to use that information to the advantage of their affiliates, it was unreasonable for the Commission to adopt a rule that would ever permit pipelines and their affiliates to share employees who deal in, and have access to, such information. Their premise appears to be that even if a pipeline attempts to compartmentalize competitively sensitive information so that, for example, a shared employee is screened off from information supplied to the pipeline by a nonaffiliated shipper, the proximity of a shared employee to such competitively significant information will "tempt" that employee to violate the confidentiality and full disclosure standards of conduct and surreptitiously take advantage of such information.

Minnesota and Hadson Gas may indeed have grounds to fear abuse of the other standards by shared pipeline and affiliate personnel, but we cannot say it was unreasonable for the Commission to conclude that such abuse could be controlled by its monitoring. Indeed, professionals such as

attorneys and accountants are regularly entrusted with information which they must hold confidential from other clients, the public, and even other personnel in their own firms or companies. We believe the Commission acted well within its discretion in determining that it need not mandate *complete* separation of pipeline and affiliate personnel *in all cases*, but rather, that the threat of enforcement actions and the public scrutiny applied to pipeline-affiliate transactions will, in most cases, "be a sufficient deterrent to preferential treatment of a marketing affiliate by its affiliated pipeline." Order 497 at 31,143.

Petitioners further argue, however, that the fact that the Commission has rejected a number of filings in which pipelines have admitted sharing operating personnel with their affiliates suggests that even the Commission has belatedly discovered the alleged inconsistency between the confidentiality and fair disclosure standards and the sharing of any operating personnel by a pipeline and its affiliate. In the cases cited by petitioners, the Commission has even noted that "shared employees will necessarily disclose all information they receive from nonaffiliated shippers." *Valero Interstate Transmission Co.*, 55 F.E.R.C. ¶ 61,283, 61,902 (1991).[10]

In our view, however, petitioners take the Commission's language out of context. Of course a shared employee who "receive[s]" information from a nonaffiliated shipper will, by definition, divulge that information to the marketing affiliate since the employee is herself working for the affiliate. The relevant question is thus not whether a shared employee who receives critical information will disclose it to the affiliate, but whether that shared employee will in fact "receive[ ]" such information in the first place, or, alternatively, how the pipeline intends to keep information supplied by nonaffiliated shippers from reaching a shared employee. In the cases cited by Minnesota and Hadson Gas, the Commission was not suggesting that the sharing of employees was *per se* inconsistent

with the confidentiality and fair disclosure standards, but merely that the pipelines involved had failed to explain *how* they intended to achieve compliance with the confidentiality standard despite the shared employee. Petitioners' assertions notwithstanding, the Commission in fact has addressed this very issue and concluded that there *are* means of achieving compliance with the confidentiality standard that are consistent with the sharing of some personnel. As the Commission noted in Order 497:

> [O]rganizational separation is [not] the only possible means of complying with the requirement not to reveal nonaffiliated shipper information. The Commission believes that other arrangements may be possible, such as segmenting the processing of transportation requests or identifying requests solely by a number rather than by name, which would have the effect of separating knowledge of these requests even though employees might work for both a pipeline and its marketing affiliate.

Order 497 at 31,139. It is thus not illogical or internally inconsistent for a regulatory scheme to preclude a pipeline from divulging to its affiliate certain kinds of information at the same time it permits, in certain cases and under certain supervisory conditions, the sharing of some personnel.

2. The "Practicability" Standard is an Irrational Response to Anticompetitive Behavior by Pipelines and Their Marketing Affiliates

Finally, even though petitioners recognize that the Commission adopted the practicability standard because "[d]ifferent pipelines are faced with different practical circumstances and may not be able to accomplish organizational separation to the same degree," Order 497 at 31,142, they nonetheless assert that the practicability standard is "totally unexplained" because "the Commission failed to explain why a pipeline-specific analysis could remedy a

---

**10.** *See also CNG Transmission Corp.*, 55 F.E.R.C. ¶ 61,296, 61,916 (1991); *Mississippi River Transmission Corp.*, 55 F.E.R.C. ¶ 61,287, 61,907 (1991); *Arkla Energy Resources Inc.*, 55 F.E.R.C. ¶ 61,286, 61,906 (1991); *Blue Dolphin Pipeline Co.*, 55 F.E.R.C. ¶ 61,284, 61,904 (1991).

problem that derives from the inherent incentive that pipelines have to favor their unregulated affiliates." Joint Brief for Minnesota and Hadson Gas at 38–39.

As with the pipeline petitioners' primary challenge to standard (g), we think Minnesota and Hadson Gas's argument is overstated. There is nothing "inexplicable" about the Commission's reasoning that the likelihood of anticompetitive practices will, as a general matter, be reduced if pipeline and affiliate personnel function independently of each other, but that with some pipelines, such as the one involved in *Ringwood Gathering Co., supra,* the medicine of complete separation of personnel would be more harmful to the public welfare than the risk of the disease itself. Minnesota and Hadson Gas certainly do not argue that the Commission was precluded from adopting a "hard" rule of separation, but providing a concomitant waiver provision for pipelines facing unique circumstances. That being the case, we see no reason to deny the Commission the discretion to adopt a relatively "soft" rule that is enforced through individual compliance proceedings.[11]

The Commission has determined that requiring pipeline and affiliate operating personnel to function independently of each other is a useful prophylactic to deter and prevent anticompetitive abuse by pipelines and their affiliates. It has also determined, however, that mandating such independent functioning to the fullest extent possible in each and every case could, in certain circumstances, cause more harm than good. The Commission's attempt to reconcile these two concerns by mandating independent functioning to the maximum extent practicable is, on the whole, a reasonable, if not logically impenetrable compromise. We therefore affirm, in its entirety, the Commission's independent functioning standard of conduct.

## V. The "Sunsetting" of the Reporting Requirements

 FERC placed a one-year "sunset" limitation on the new reporting (though not the new disclosure) requirements, stating as follows:

> Given the possibility that market affiliate abuses may not be a serious long-term problem as transportation service becomes more competitive, the reporting requirement should be the subject of a review by the Commission after one year and an affirmative Commission decision by December 31, 1989, on whether to continue the reporting requirements as a necessary element of the regulatory framework. Accordingly, the Commission is adopting a sunset provision for the reporting requirement of December 31, 1989. This requirement should meet the Commission's need for more information and protect the public from the possible exercise of pipelines of residual market power over transportation service as the industry moves toward increased competition. The Commission is free to find, at the end of the reporting requirement period which expires December 31, 1989, that there is a need to extend the reporting requirement.

Order 497 at 31,139. In three subsequent orders, Order 497–A, Order 497–B, and Order 497–C, the Commission has extended the life of the reporting requirements by one year—to the end of 1990, 1991, and 1992.

Petitioners Minnesota & Hadson attack the sunset provision as irrational. FERC determined that the reporting requirements are "necessary to determine whether anticompetitive conduct is occurring," Order 497–A at 31,600, and, petitioners say, it is fundamentally inconsistent to adopt reporting requirements while allowing for the automatic elimination of them. These petitioners also argue that the sunset requirement sends the wrong message to pipe-

---

**11.** Minnesota and Hadson Gas also object that the Commission's orders fail to define "operating employees" and "independent functioning." Even petitioners recognize, however, that "the Commission is entitled to a certain leeway in promulgating a general standard that will be given more complete definition when it is applied on a case-by-case basis." Joint Brief for Minnesota and Hadson Gas at 41. We think petitioners' challenge as to these two regulatory phrases falls within that concession.

lines, implying that FERC is not serious about its new regulations, and that sunsetting is unworkable because it will take the Commission too long to restore the reporting requirements. FERC responds that the sunsetting provision is an appropriate regulatory response in the rapidly evolving natural gas industry.

To the extent petitioners are arguing that the regulatory scheme *must* include reporting requirements, the argument is premature because the reporting requirements remain very much in force. To the extent petitioners are arguing that the sunsetting requirement is beyond the Commission's discretion, the argument borders on frivolous. The reporting requirements have benefits, to be sure, but they also have costs. FERC clearly did not abuse its discretion when it decided to provide for an annual weighing of the costs and benefits. Finally, the fact that FERC has extended the reporting requirements three times rebuts petitioners' argument that the sunsetting approach is unworkable. We reject petitioners' challenge to the sunsetting provision.

VI. Civil Penalties Under the NGPA

In Order 497, FERC announced it would assess civil penalties of up to $5,000 per day for knowing violations of the § 161.3 standards of conduct or the § 250.16 record keeping and reporting requirements. Order 497 at 31,153; 18 C.F.R. § 250.16(h). These penalties could be assessed against pipelines transporting gas under "subparts B, G, H, or K" of 18 C.F.R. Part 284. Subpart B implements § 311(a)(1) of the NGPA, 15 U.S.C. § 3371(a)(1), and allows interstate pipelines to transport gas for intrastate pipelines and LDCs. 18 C.F.R. § 284.101. Subpart G implements § 7 of the NGA, 15 U.S.C. § 717f, and authorizes interstate pipelines to provide open-access transportation under blanket certificates. 18 C.F.R. § 284.221. Subpart H has been reserved and subpart K allows interstate pipelines to transport gas on the outer-continental shelf under § 7 of the NGA. 18 C.F.R. § 284.301.

The pipeline petitioners concede that § 504(b) of the NGPA, 15 U.S.C. § 3414(b), permits FERC to penalize violations of orders issued under the NGPA, but they point out that the NGA does not contain similar penalty authority. Asserting that FERC promulgated Order 497 to prevent undue discrimination under both § 4(b) of the NGA, 15 U.S.C. § 717c, and § 311 of the NGPA, the pipelines contend that FERC may not use its NGPA penalty power against acts that constitute undue discrimination only under the NGA. For example, the pipelines urge that if a pipeline transporting gas under an NGA subpart G blanket authorization fails to satisfy the reporting requirements, FERC may punish this violation only with the remedies authorized by the NGA, not with an NGPA remedy such as civil penalties.

 Petitioners identify a potentially knotty problem concerning the reach of FERC's civil penalty authority. They have not, however, convinced us that their complaint is ripe. Ripeness turns on "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Fitness depends on, among other things, whether the issue "presents a purely legal question" of the type that courts might consider without requiring "exhaustion of administrative remedies." *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967). Under this standard, the petitioners may have presented us with a question fit for judicial review. In *Athlone Indus. v. Consumer Products Safety Comm'n*, 707 F.2d 1485 (D.C.Cir.1983), we held that exhaustion did not bar a declaratory judgment action on the Consumer Product Safety Commission's authority to assess civil penalties. The petitioners in *Athlone* brought their action after a Commission Administrative Law Judge ordered civil penalties, but before they completed administrative appeals. *Id.* at 1487. The district court dismissed on exhaustion grounds. We reversed, holding that the authority to assess penalties was a purely legal question that

would not benefit from further factual development. *Id.* at 1488–89.

Although *Athlone* supports the pipeline petitioners as to the fitness of their claim, they still must show that delay in settling the civil penalties issue will cause them to suffer a hardship. We recall that in *Athlone* the petitioners brought their claim after the Commission assessed civil penalties against them, thus imposing an immediate hardship. In contrast, FERC advises us that it has not yet assessed a civil penalty for NGA transportation under 18 C.F.R. § 250.16(h), and that it may never do so, as it has alternative remedies under the NGA. Brief for Respondent FERC at 40; *see* NOPR, F.E.R.C. Stats. & Regs. ¶ 32,445, at 33,540 (discussing remedies available under the NGA, such as ordering refunds and seeking injunctive relief).

In the absence of an enforcement proceeding to satisfy the hardship prong, the pipelines must show that the penalties provision somehow has a direct and immediate effect on their primary conduct. *Toilet Goods Ass'n*, 387 U.S. at 164, 87 S.Ct. at 1525. *See also South Carolina Elec. & Gas Co. v. ICC*, 734 F.2d 1541, 1545 (D.C.Cir.1984) (holding that petitioners failed to show hardship when their challenge did not arise in the context of an enforcement action and the contested regulation did not "compel or call into question any primary conduct in which petitioners engage"); *cf. Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 60, 109 S.Ct. 916, 925–26, 103 L.Ed.2d 34 (1989) (holding that a constitutional challenge to discretionary civil remedies under RICO had not ripened, and explaining that "[t]hese claims can only be reviewed when (or if) such remedies are enforced against petitioner.").

This Circuit has remarked that the "paradigmatic hardship situation" is one in which "a petitioner is put to the choice between incurring substantial costs to comply with allegedly unlawful agency regulations and risking serious penalties for noncompliance." *Natural Resources Defense Council v. EPA*, 859 F.2d 156, 166 (D.C.Cir.1988). As opposed to the reporting requirements of Order 497, which unquestionably fit within the paradigm, the penalty provisions themselves are but a consequence of violating a regulation affecting primary conduct. The pipelines will face no agonizing "should we pay or should we ignore the penalties" dilemma in the course of their day-to-day activities; if FERC ever assesses a penalty, the pipelines will at that time enjoy a full opportunity to challenge FERC's authority. Since the pipelines have failed to demonstrate that "irremediable adverse consequences flow from requiring a later challenge," *Toilet Goods Ass'n*, 387 U.S. at 164, 87 S.Ct. at 1525, we find that their challenge of the civil penalties provision is not ripe.

## VII. Application of Order 497 to Joint Ventures

In separate petitions, two joint ventures, Northern Border Pipeline Company and Ozark Gas Transmission Company seek review of Commission orders finding Order 497 applicable to their operations. By its terms, Order 497 applies to "any interstate natural gas pipeline that transports gas for others ... and is affiliated with a natural gas marketing" entity. 18 C.F.R. § 161.1. Borrowing the definition contained in § 2(27) of the NGPA, 15 U.S.C. § 3301(27), FERC declared that "[a]ffiliate, when used in relation to any person, means another person which controls, is controlled by, or is under common control with, such person." 18 C.F.R. § 161.2 (emphasis omitted). In turn, FERC defined "control" as including "the possession, directly or indirectly and whether acting alone or in conjunction with others, of the authority to direct or cause the direction of the management or policies of a company." 18 C.F.R. § 161.2. To demonstrate "control," FERC provided that a "voting interest of 10 percent or more creates a rebuttable presumption of control." *Id.*

The Commission explained in Order 497 that it established the rebuttable presumption of control as a pragmatic response to "situations in which a pipeline and a marketer are not technically affiliated but the pipeline has a beneficial interest in the marketer." Order 497 at 31,131 (citing *Midwest Gas Users Ass'n v. FERC*, 833 F.2d

341, 351–54 (D.C.Cir.1987) (remanding a FERC "arms-length bargaining" test because it failed to consider economic facts and incentives)). More specifically, in Order 497–A the Commission stated that the rebuttable presumption of control had special application to joint ventures:

> In this situation, a single pipeline owner may not be in a position to favor its affiliate over the affiliates of other pipeline owners. However, the pipeline owners as a group have an incentive to grant preferences to their own affiliates over other shippers.

Order 497–A at 31,593.

In their petitions for review, Northern Border and Ozark argue principally that FERC misapplied the definitions of "affiliate" and "control" and did not base its orders on substantial evidence. Accordingly, we review the challenged orders to discern whether the Commission "specif[ied] the evidence on which it relied" and "explain[ed] how that evidence supports the conclusion it reached." *City of Charlottesville v. FERC*, 661 F.2d 945, 950 (D.C.Cir. 1981). We must also assure ourselves that the "Commission has given reasoned consideration to each of the pertinent factors" before it. *Office of Consumers' Counsel v. FERC*, 783 F.2d 206, 227 (D.C.Cir.1986) (emphasis and internal quotations omitted).

## A. *Northern Border*

 Northern Border is a general partnership providing pipeline transportation service, and is composed of five subsidiaries of four natural gas pipelines, with the ownership interests of the five partners ranging from 35 to 12.25 percent.[12] The owner pipelines of all five partnership entities have marketing affiliates. Before the Commission, Northern Border argued that Order 497 did not apply to its operations because it has no marketing affiliates and Northern Border's owner pipelines do not control partnership operations in such a manner as to connect the parents' affiliates with the partnership.

Rejecting this argument, the Commission "believe[d]" that the owner pipelines could "seek and potentially obtain a preference from Northern Border for the transportation of gas on their behalf or on behalf of their marketing affiliates." *High Island Offshore System, et al.*, 49 F.E.R.C. ¶ 61,340, at 62,225 (1990). Finding that "Northern Border has presented no facts or information to rebut the presumption that its overlapping economic interests with its owner-pipelines provide an incentive for the granting of a preference," the Commission directed Northern Border to comply with Order 497 whenever it "transports gas in a marketing transaction for a marketer or broker affiliated with it or with any of its owner pipelines." *Id.* at 62,225–26.

Northern Border contends that the Commission erred by failing "to demonstrate how the perceived 'incentive' of Northern Border's joint owners established the predicate 'control' relationships necessary to create an 'affiliation' between any specific marketing or brokering entity and Northern Border." Brief for Petitioner Northern Border at 14. We think this objection confuses FERC's admittedly sparse analysis. Northern Border does not dispute that its owner pipelines, each of which uncontestedly controls a marketing affiliate, held a voting interest of over 10% in the partnership, thereby triggering the rebuttable presumption of control and potentially providing the predicate necessary for FERC to find Order 497 applicable. As such, Northern Border is required to come forward with substantial evidence demonstrating that the partnership's management structure or some incompatibility of economic interests among the owner pipelines rebutted the presumption that the owner pipelines could, "acting alone or in conjunction with others, [exercise] the authority to di-

12. Specifically, the Northern Border partners, their parents, and their ownership interests in the venture are as follows: Northern Plains Natural Gas Co., a subsidiary of Enron Corp., 35%; Pan Border Gas Co., a subsidiary of Panhandle Eastern Corp., 22.75%; TransCanada Border PipeLine Ltd., a subsidiary of TransCanada PipeLines Limited, 16%; Trans Can Northern Ltd., also a subsidiary of TransCanada PipeLines Limited, 14%; and Northwest Border Pipeline Co., a subordinate of the Williams Companies, 12.25%.

rect or cause the direction" of the partnership. 18 C.F.R. § 161.2.

Unlike Northern Border, we do not read FERC's order as replacing "control" with "incentive," but rather as examining whether, in addition to "control," the owner pipelines shared with the partnership an economic incentive to discriminate in favor of the owner pipelines' marketing affiliates. This focus on incentive is consistent with the approach suggested in *Midwest Gas*, where we rejected FERC's narrow definition of "arms-length bargaining" because it failed to consider whether the parties to a transaction shared an economic interest in distorting the contractual price for gas. 833 F.2d at 354. It is also consonant with the only case relied on by Northern Border, *Florida Gas Transmission Co. v. FPC*, 362 F.2d 331 (5th Cir.1966), which cautioned that "[m]ere influence arising out of business relationships where control *is not present* is not a proper standard" for defining an affiliate. *Id.* at 336 (emphasis added).

As distinguished from the FPC's action in *Florida Gas*, FERC did not in this instance leap to an economic interest analysis without first considering whether control was present. Each of Northern Border's owner pipelines held a sufficient voting interest in the partnership to fit within the rebuttable presumption of predicate control. In fact, two of the owner pipelines, Enron Corp. and Panhandle Eastern Corp., could combine to create a voting block of 57.75% capable of directing the affairs of the partnership. This constituted the substantial evidence leading FERC to surmise that "the ownership of Northern Border by major interstate pipelines" created the possibility that the owner pipelines could "potentially obtain a preference from Northern Border" for their marketing affiliates. 49 F.E.R.C. at 62,225.

It was then incumbent on Northern Border to rebut this presumption by showing either that the pipeline owners could not, in combination, direct the affairs of the partnership or, even if they could, that the pipeline owners had no economic incentive to combine and use the partnership to favor their marketing affiliates. As nothing has been presented indicating that FERC erred in finding that Northern Border failed to come forward with any record evidence on these points, we deny Northern Border's petition for review.

## B. *Ozark*

██ Ozark is a general partnership providing pipeline transportation service, and is composed of subsidiaries of four natural gas pipelines, each of which has a 25% ownership and voting interest in the partnership.[13] Two of the owner pipelines, USX and Tennessee Gas, have marketing affiliates shipping on Ozark's pipeline. Because USX and Tennessee Gas were each affiliated with a marketing affiliate and Ozark, FERC required Ozark to comply with Order 497. *Ozark Gas Transmission System*, 43 F.E.R.C. ¶ 61,443, at 62,109–10 (1988).

Ozark raised objections to the imposition of Order 497 requirements in a request for rehearing, which FERC denied. *Ozark Gas Transmission System*, 49 F.E.R.C. ¶ 61,247, at 61,869 (1989). Based on its finding that the "parent companies have a 25 percent interest in Ozark and therefore are presumed to have control over Ozark," FERC observed that the "ownership of Ozark by common parent companies with the shippers raises the possibility that the [parent] companies may seek and potentially obtain a preference from Ozark for the transportation of gas on their behalf or on behalf of their marketing affiliates." *Id.* at 61,870. FERC then found that Ozark "failed to present facts to rebut the presumption that the overlapping economic interests of its owners provide an incentive for the granting of a preference," and re-

---

13. The specific Ozark Gas Transmission System partners and parent entities are as follows: Ozark Gas Pipeline Corp, a subsidiary of USX Corp.; Columbia Gulf Transmission Co., a subsidiary of The Columbia Gas System; Caney River Transmission Co., a subsidiary of ONEOK, Inc.; and Tennessee Ozark Gas Co., a subsidiary of Tennessee Gas Pipeline Co., which in turn is a subsidiary of Tenneco Inc.

affirmed its order subjecting Ozark to the requirements of Order 497. *Id.*

Ozark complains that FERC ignored record evidence tending to rebut the presumption of control. In particular, Ozark points to its Partnership Agreement, which specifies that the partnership's Management Committee "may only act with the *unanimous* vote of the partners." Brief for Petitioner Ozark at 4 (citing Ozark Rehearing Record at 267–68). Ozark asserts that this provision removes the possibility of a pipeline owner with an affiliate directing the affairs of the partnership. Indeed, since only two of the owner pipelines have marketing affiliates shipping on Ozark's line, Ozark contends that the other two partners will have no incentive to discriminate in favor of their partners' affiliates. Thus, Ozark contends that the unanimity requirement rebuts any presumption that the owner pipelines with marketing affiliates could combine and direct the affairs of the partnership.

We agree that FERC failed to address the effect of Ozark's evidence on the question of control. Without remarking at all on the unanimity requirement in Ozark's partnership agreement, FERC rushed to conclude that Ozark had failed to "rebut the presumption that the overlapping economic interests of its owners provide an incentive for the granting of a preference." *Ozark Gas Transmission System,* 49 F.E.R.C. at 61,870. As we noted above, however, FERC's economic interest analysis is appropriate only after it has properly determined that "control" exists. Here, FERC articulated no findings on whether "control" existed and provided no explanation as to why Ozark's rebuttal evidence did not defeat the presumption of control. By ignoring the predicate "control" question, FERC failed adequately to consider relevant evidence regarding the ability of owner pipelines with affiliates to control the partnership. This failure falls afoul of our requirement that an agency engage in reasoned decisionmaking by supporting its conclusions with " 'substantial evidence' in the record." *Electricity Consumers Resource Council v. FERC,* 747 F.2d 1511,

1513 (D.C.Cir.1984). Subsumed in the substantial evidence requirement is the expectation that agencies will treat fully "each of the pertinent factors" and issues before them. *Public Serv. Comm'n of New York v. FPC,* 511 F.2d 338, 345 (D.C.Cir.1975). Otherwise, the opportunities for notice and hearing in administrative proceedings would be largely illusory, with agencies free to disregard those facts or issues that prove difficult or inconvenient. Based on this reasoning, we found in *Office of Consumers' Counsel v. FERC,* 783 F.2d 206, 227 (D.C.Cir.1986), that a FERC order neglectful of pertinent facts on the record must crumble for want of substantial evidence. So too here we conclude that FERC's refusal to come to grips with Ozark's rebuttal evidence is irreconcilable with the Commission's responsibility to support its decisions with substantial evidence. If FERC is going to have a rebuttable presumption, it may not ignore evidence calling that presumption into question. Accordingly, we remand for further proceedings consistent with this opinion.

## VIII. Conclusion

For the reasons discussed above, we deny in most respects the challenges raised by the pipeline petitioners in No. 89–1768, *et al.* We set aside only that portion of standard (f) that requires the contemporaneous disclosure of marketing and gas sales and supplies information. We also deny the petitions filed by Minnesota in No. 90–1055, Hadson in No. 90–1005, and Northern Border in No. 89–1772, but we grant the petition for review filed by Ozark in No. 90–1025.

*It is so ordered.*